**GRANITE SCHOOL DISTRICT,
Plaintiff,**

v.

**SHANNON M., a minor, by her parents,
MYRNA M. and Dan M., Defendant.**

No. 90–C–0728–S.

United States District Court,
D. Utah, C.D.

March 23, 1992.

Michele Mitchell, Salt Lake City, Utah, for plaintiff.

Robert B. Denton, Lisa A. Marcy, Salt Lake City, Utah, for defendant.

## MEMORANDUM DECISION AND ORDER

SAM, District Judge.

### I. INTRODUCTION [1]

■ The court has before it the Motion by plaintiff Granite School District ("Gran- ite") for Summary Judgment and the Motion by Shannon M. ("Shannon") to Affirm Judgments of Administrative Hearing Officer and of State Review Panel. Shannon also requests attorney's fees. Subsequent to argument on this matter, Shannon also moved the court for rehearing.[2]

In brief, Granite seeks the court's order that federal law does not compel it to provide Shannon with full-time nursing care during school hours. Shannon claims that Granite is required by the Individuals with Disabilities Education Act (the "Act"), 20 U.S.C. § 1400 *et seq.*, to provide the constant tracheostomy care she needs in order to attend school.

The Act provides federal money to state and local agencies to assist them in educating children with disabilities. Receipt of these funds is conditioned on the state's ability to demonstrate that all children with disabilities are assured "the right to a free appropriate public education." 20 U.S.C. § 1412(1). The state is also required, to the extent appropriate, to educate children with disabilities with children who are not handicapped. 20 U.S.C. § 1412(5); 34 C.F.R. § 300.550(b)(1) (1991). The education of each handicapped child must be tailored to that child's individual needs through development of an Individualized Education Program ("IEP"), which is prepared at meetings between school personnel, the child's parents, and in some cases,

---

1. The court acknowledges the good faith and desire of all parties to secure for Shannon M. the proper care and most appropriate education possible under the relevant facts and law. That this common desire has led to differences in opinion as to that care and education, speaks no less highly of the concern exhibited by all involved. The court wishes to compliment the parties and counsel for the professional and caring way in which this matter has been presented to the court.

2. On December 13, 1991, subsequent to oral argument and subsequent to the court orally informing the parties of its disposition that the requested nursing care is not a related service under the Individuals with Disabilities Education Act, Shannon moved the court for rehearing "based upon a change in regulations governing the availability of private duty nursing service in a school setting, the cost of which can now be covered by Medicaid reimbursement. Granite's opposing memorandum was filed on January 15, 1992 and Shannon's reply memorandum was filed January 24, 1992. The gist of Shannon's motion is that cost appears no longer to be a factor and, therefore, Granite's opposition to providing care is moot or, at least, analytically flawed. The court, however, agrees with Granite's position that a change in Medicaid policy has no impact on what constitutes a related service under the Individuals with Disabilities Education Act. The new Medicaid policy provides that *"only* those individuals who require and are authorized to receive private duty nursing services" may use those services in a school setting. *Pullen v. Cuomo*, 18 IDELR 132, 133 (N.D.N.Y. August 7, 1991). The policy does not expand conditions of entitlement or amount of service.

the child. 20 U.S.C. §§ 1401(a)(18), (20), 1414(a)(5). Parents who are dissatisfied with their child's IEP are entitled to an impartial due process hearing and can further appeal to a state educational agency. Either the school district or the parents can then appeal to a state court or a federal district court. *Id.* at § 1415(b)(2), (c), (e)(2).

Shannon's parents, following the statute's provisions, requested a due process hearing, claiming that Granite was required under the Act to provide Shannon with nursing care. The Administrative Due Process Hearing Officer, and, subsequently, the State Level Review Hearing Panel found that Granite was required to provide full-time nursing service at school as a related service under the Act. Granite has appealed those administrative decisions to this court pursuant to § 1415(e) of the Act.

## II. FACTS

For purposes of this action, the parties have stipulated to the following facts. Shannon is a six-year old student who attended kindergarten classes at Granite's Orchard Elementary during the 1989–90 school year. She suffers from congenital neuromuscular atrophy and severe scoliosis and is confined to a motorized wheelchair. Shannon is classified as "orthopedically impaired" under the Act. She breathes through a tracheotomy tube in her windpipe, which must be suctioned to loosen mucous and reduce the chances of a potentially life-threatening mucous plug. Shannon also receives her food through a nasogastric tube, which the nurse attends to. Shannon's nurse typically suctions Shan-

non's tracheostomy tube five times during a three-hour school day, including the bus ride. In spite of suctioning, Shannon's tracheostomy tube occasionally gets a mucous plug. Shannon cannot breathe until the plug is broken up or the tracheostomy tube is changed. When a plug occurs, Shannon's caretaker uses saline solution, tries to suction, and then changes the tube if the first two do not work. Sometimes, Shannon needs an ambu bag (a portable ventilator) to open her lungs if her color is bad and she is not getting enough oxygen. Shannon needs someone available in case she has problems with respiration, suctioning, her nasogastric tube, pain or positioning. Granite has a "do not resuscitate" order from Shannon's doctor stating that heroic measures are not to be used if Shannon should suffer cardiac arrest. In 1991, Shannon was scheduled to start first grade, which consists of a seven hour day. The parties agree that Shannon should have at least a licensed practical nurse to perform the necessary care.[3] The estimated cost for full time nursing care for the school year is $30,000.

## III. DISCUSSION

The issue before the court is whether the health care, which Shannon needs in order to attend school, must be provided by Granite as part of her free appropriate public education. More specifically, the court must decide whether full time nursing care for Shannon is a supportive service required by the Act, or whether it is a medical service excluded under the Act.[4] The question is one of law, which the court reviews *de novo*.[5]

---

**3.** Although Shannon's parents have stated that they are not concerned with who provides the care, so long as it is provided, they have stipulated, for purposes of this action, that the care of at least a licensed practical nurse is required.

**4.** Shannon asserts that the issue before the court is whether tracheostomy care and nasogastric feeding tube care, not full-time nursing care, is a related service under the Act. Inasmuch as the parties have stipulated that Shannon's tracheostomy and nasogastric tube care should be performed by either a licensed practical nurse or a registered nurse, the court finds no relevant

distinction between the issue posed by Granite and that argued by Shannon.

**5.** "In reviewing the complaint, the Act provides that a court 'shall receive the record of the [state] administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.' § 1415(e)(2)." *Hendrick Hudson Dist. Bd. of Ed. v. Rowley,* 458 U.S. 176, 205, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982). A district court reviews cases brought under the Act *de novo,* while being advised to give due weight to the administrative proceed-

### 1. *Free Appropriate Public Education*

Receipt of funds under the Act is conditioned on the state's compliance with procedures enumerated within the Act, one of which is that the school must demonstrate that all children with disabilities have the "right to a free appropriate public education." 20 U.S.C. § 1412(1).

A free appropriate public education is defined as "special education and related services." 20 U.S.C. § 1401(a)(18). Special education is defined as "specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a child with a disability, including (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education." 20 U.S.C. § 1401(a)(16). Related services consist of:

> [T]ransportation, and such developmental, corrective, and other *supportive services (including* speech pathology and audiology, psychological services, physical and occupational therapy, recreation, including therapeutic recreation and social work services, and *medical* and counseling *services,* including rehabilitation counseling, *except that such medical services shall be for diagnostic and evaluation purposes only* ) *as may be required to assist a child with a disability to benefit from special education,* and includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(a)(17) (emphasis added). Related services also has been defined by regulation to include school health services and school health services "means services provided by a qualified school nurse or other qualified person." 34 C.F.R. 300.-13(b)(10) (1991).

The Act requires that "to the maximum extent appropriate," a child with a disability be mainstreamed or educated with children who are not disabled. 20 U.S.C. § 1412(5). A child is to be removed from the regular classroom environment only when "the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily ...". *Id.*

Shannon contends that Granite is required by the Act to provide, as a "related service", the full-time nursing care which she needs in order to attend school. In essence, Shannon argues that she needs tracheostomy care to attend school and she needs to attend school to benefit from her special education.[6]

Granite's position is that the law requires it to provide Shannon with a basic floor of opportunity which she receives through home-bound instruction, rather than maximization of Shannon's potential, which she seeks through full-time nursing care in the classroom. Granite further claims that the type of care that Shannon is requesting is not required under the Act because full time nursing care is a medical service, beyond diagnosis or evaluation, and is thus excluded under the Act.

### 2. *A Basic Floor of Opportunity—Sufficient Supportive Services to Benefit from Education*

In *Hendrick Hudson Dist. Bd. of Ed. v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Supreme Court recognized that the Act was not intended to guarantee any particular substantive level of education. Rather, the Court noted that what was required was access to education sufficient to provide "some educational benefit".[7] *Rowley* is instructive on "[w]hat

---

ings provided for under the Act. *Id.* at 205–206, 102 S.Ct. at 3050. The Supreme Court's admonishment to lower courts is that "once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States." *Id.* at 208, 102 S.Ct. at 3052.

**6.** Specifically, Shannon contends that, if she is unable to attend school, she will not have access

to the physical, consultative and occupational therapy and other services enumerated on her IEP.

**7.** In *Rowley,* the Court stated: "Implicit in the congressional purpose of providing access to a 'free appropriate education' is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child." *Rowley,* 458 U.S.

is meant by the Act's requirement of a 'free appropriate public education'.... And what is the role of ... federal courts in exercising the review granted by 20 U.S.C. § 1415...." *Id.* at 186, 102 S.Ct. at 3040. In that case, the Court upheld the decision of a school district which had denied requests by Amy Rowley's parents that she be provided with a sign language interpreter in the classroom. The school district had decided to provide an FM hearing aid for the deaf child and thus encourage Amy's self-sufficiency. Amy's parents, who were also deaf, insisted that denial of the interpreter in the classroom denied Amy of a free appropriate public education.

The lower courts focused on the disparity between what Amy could have learned in the classroom if she could hear, and what she was learning at the time. They decided that she was not receiving the required free and appropriate public education, which the district court defined as " 'an opportunity to achieve [her] full potential commensurate with the opportunity provided to other children.' " *Id.* at 186, 102 S.Ct. at 3040 (quoting *Rowley v. Bd. of Ed. of Hendrick Hudson Cent. S.D.*, 483 F.Supp. 528, 534 (M.D.Ala.1980)).

In reversing, the Supreme Court stated that "if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, and the other items on the definitional checklist are satisfied, the child is receiving a 'free appropriate public education' as defined by the Act." *Id.* 458 U.S. at 189, 102 S.Ct. at 3042.[8] The Court specifically found that "the requirement that a State provide specialized educational services to handicapped children generates no additional requirement that the services so provided be sufficient to maximize each child's potential 'commensurate with the opportunity provided other children.' " *Id.* at 198, 102 S.Ct. at 3046. After examining the legislative history of the Act, the Court "conclude[d] that the 'basic floor of opportunity' provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id* at 201, 102 S.Ct. at 3048. The Court noted that if Congress wants to impose a condition on a grant of federal money to the schools, such as the achievement of each child's maximum potential, it must do so unambiguously. *Id.* at 204, n. 26, 102 S.Ct. at 3049, n. 26.

*Rowley* provides a two-part inquiry to be applied by reviewing courts under § 1415 of the Act: (1) Whether the procedural requirements of the Act have been complied with; and (2) Whether the child's IEP is "reasonably calculated to enable the child to receive educational benefits". *Id.* at 206–207, 102 S.Ct. at 3051. The Court further noted that, once the two requirements are satisfied, "the State has complied with the obligations imposed by Congress and the courts can require no more." *Id.* at 207, 102 S.Ct. at 3051.

Similarly, in *Irving Independent School District v. Tatro*, 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984),[9] the Supreme Court applied a two-part inquiry to determine whether a given service is a related service under the Act: (1) Is the care a supportive service necessary to enable a

---

at 200, 102 S.Ct. at 3047. Earlier in its opinion, the Court noted: "That the Act imposes no clear obligation upon recipient States beyond the requirement that handicapped children receive some form of specialized education is perhaps best demonstrated by the fact that Congress, in explaining the need for the Act, equated an 'appropriate education' to the receipt of some specialized educational services." *Id.* at 195, 102 S.Ct. at 3045.

8. The Court further stated:
 When the language of the Act and its legislative history are considered together, the requirements imposed by Congress become tol-erably clear. Insofar as a State is required to provide a handicapped child with at 'free appropriate public education', we hold that it satisfies this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.
 *Rowley*, 458 U.S. at 203, 102 S.Ct. at 3049.

9. Shannon relies on the facts and analysis of *Tatro* to urge that tracheostomy care, including nasogastric feeding, is a related service necessary to enable her to benefit from her special education.

handicapped child to benefit from special education; and, (2) Is the service excluded by the Act as a "medical service", aside from any diagnostic or evaluation purpose. *Id.* at 890, 104 S.Ct. at 3375.

Amber Tatro was an eight-year-old girl who suffered from a neurogenic bladder disorder [10] which prevented her from emptying her bladder voluntarily and required clean intermittent catheterization ("CIC") every three or four hours. CIC is "a procedure involving the insertion of a catheter into the urethra to drain the bladder." *Id.* at 885, 104 S.Ct. at 3373. CIC is a simple procedure and can be performed in minutes by a layperson with very little training. It was expected that Amber herself would soon be able to perform the procedure. *Id.* The Irving Independent School District developed an IEP for Amber which explicitly called for her placement in early childhood development classes but which made no provision for someone to perform CIC. The Supreme Court held that CIC service was a supportive service "required to assist a handicapped child to benefit from special education." *Id.* at 891, 104 S.Ct. at 3376 (quoting 20 U.S.C. § 1401(a)(17)).

The Court, however, qualified the obligation of schools to provide supportive service.

> To keep in perspective the obligation to provide services that relate to both the health and educational needs of handicapped students, we note several limitations that should minimize the burden petitioner fears. First, to be entitled to related services, a child must be handicapped so as to require special education.
>
> . . . . .
>
> Second, only those services necessary to aid a handicapped child to benefit from special education must be provided, regardless [of] how easily a school nurse or layperson could furnish them. . . .
>
> Third, the regulations state that school nursing services must be provided only if they can be performed by a nurse or other qualified person, not if they must

be performed by a physician. See 34 C.F.R. §§ 300.13(a), (b)(4), (b)(10) (1983). *Tatro*, 468 U.S. at 894, 104 S.Ct. at 3378.

Instructive authority is also found in *Thomas v. Cincinnati Bd. of Ed.*, 918 F.2d 618 (6th Cir.1990), in which the Sixth Circuit ruled that a child who required tracheostomy and gastrostomy tube care could gain reasonable benefits from five hours of weekly home instruction even though the school-based program might provide more related services. Emily Thomas was a multi-handicapped child who also breathed through a tracheostomy tube which required constant monitoring and suctioning. *Id.* at 621. Emily's revised IEP called for instruction in the home rather than in the classroom. The district court found that Ohio law reserved home instruction for students who are unable to attend school, and that since Emily could attend school if transported by ambulance, home instruction was not an option. *Id.* at 623. The district court also found that the home instruction option was not the least restrictive environment for Emily and thus an inappropriate placement. *Id.* at 626. In reversing the district court, the Sixth Circuit found that the IEP developed by the school was "reasonably calculated to enable Emily to receive educational benefits." *Id.* at 626 (citing *Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, 458 U.S. 176, 207, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982)). The court reasoned that:

> Although it appears that Emily may receive fewer related services at home than at the SMI program, we are not deciding which placement would be more advantageous to Emily's development, only whether the revised IEP will enable her to benefit. All the experts agreed that Emily would benefit educationally from the revised IEP providing for additional home instruction and, indeed, plaintiff does not contend that this IEP is not appropriate, only that it is not as good as the SMI program. . . . Since there is no dispute over whether the revised IEP

---

**10.** Amber Tatro was born with a defect known as spina bifida. In addition to a neurogenic bladder, she also suffered from orthopedic and speech impairments. *Tatro*, 468 U.S. at 885, 104 S.Ct. at 3373.

will enable Emily to benefit educationally, we conclude that the school district has satisfied the Act's substantive provisions.

*Id.* at 627.[11]

### 3. Medical Services Exclusion

■ As noted, the Act requires that all eligible children receive special education and related services which include "supportive services" required by the handicapped child to benefit from his or her special education. However, medical services, except for "diagnostic and evaluation purposes", need not be provided.

In *Tatro,* the Court found that CIC service was not excluded by the medical service provision of the Act. *Id.* 468 U.S. at 890–91, 104 S.Ct. at 3376.[12] The Court specifically found that CIC services for Amber Tatro were not materially different from services provided to non-handicapped children.[13] *Id.* at 893, 104 S.Ct. at 3377.

The specific holding of *Tatro* is that CIC service is a supportive service not subject to the medical services exclusion of the Act. The court does not read *Tatro* to stand for the proposition that *all* health services performed by someone other than a licensed physician are related services under the Act regardless of the amount of care, expense, or burden on the school system and, ultimately, on other school children.

Other courts interpreting *Tatro* have found Shannon's asserted interpretation,[14] based on the physician-non-physician provider, too narrow. The court concurs with the analysis and authorities set forth in *Clovis Unified School Dist. v. California Office of Adm. Hearings,* 903 F.2d 635 (9th Cir.1990). That case involved, *inter alia,* the issue of whether the school was required by the Act to pay for care of an emotionally disturbed child in a psychiatric hospital as a related service. The parents urged "a narrow definition of medical services, contending that, under *Tatro,* medical services are only those services that must be provided by a licensed physician." *Id.* at 643. The Court of Appeals for the Ninth Circuit, in rejecting that argument, stated:

A number of District Courts have faced this issue and have concluded that the "licensed physician" distinction is inadequate as the sole criterion for determining when services fall under the medical exclusion from liability. In *Max M. v. Thompson,* 592 F.Supp. 1437 (N.D.Ill.1984), the District Court held that psychotherapy, a recognized related service under the Act, does not become excluded as a medical service *merely* because it is provided by a psychiatrist—a licensed physician—rather than by a psychologist. We agree with the reasoning of this opinion, and with its rejection of an arbitrary classification of services based solely on the licensed status of the

11. The court acknowledges that in this case Shannon asserts that her IEP is not appropriate.

12. The Court noted that regulations of the Secretary of Education, which are entitled to deference, had already determined that "the services of a school nurse otherwise qualifying as a 'related service' are not subject to exclusion as a 'medical service' but that the services of a physician are excludable as such". *Tatro,* 468 U.S. at 892, 104 S.Ct. at 3377. The Court acknowledged that "[a]lthough Congress devoted little discussion to the 'medical services' exclusion, the Secretary could reasonably have concluded that it was designed to spare schools from an obligation to provide a service that might well prove unduly expensive and beyond the range of their competence". *Id.* at 892, 104 S.Ct. at 3377.

13. The Court stated: "Nurses in petitioner School District are authorized to dispense oral medications and administer emergency injec-

tions in accordance with a physician's prescription. This kind of service for nonhandicapped children is difficult to distinguish from the provision of CIC to the handicapped. It would be strange indeed if Congress, in attempting to extend special services to the handicapped, were unwilling to guarantee them services of a kind that are routinely provided to the nonhandicapped." *Tatro,* 468 U.S. at 893–894, 104 S.Ct. at 3377–3378.

14. Shannon asserts that "if a nurse is able to provide the service, this service is a supportive service, which is not excluded as a 'medical service'. If a physician must provide the service, this service is considered to be of a medical nature and is therefore excluded under the Act." Defendant's Memorandum in Support, p. 22.

service provider. If a licensed physician may provide related services without their becoming instantly "medical," we believe that by the same token a program clearly aimed at curing an illness— whether mental or physical—does not become instantly "related" when it can be implemented by persons other than licensed physicians.

The post-*Tatro* case of *Detsel v. Board of Education of Auburn,* 637 F.Supp. 1022 (N.D.N.Y.1986), *aff'd* 820 F.2d 587 (2d Cir.), *cert. denied,* 484 U.S. 981, 108 S.Ct. 495, 98 L.Ed.2d 494 (1987), is even more on point. There a district court found that intensive life support service necessary to maintain a child in school fell outside the "related services" mandated by the Act and "more closely resemble[d] the medical services specifically excluded by § 1407(17) of the [EHA]," despite the fact that the services could be provided by a practical nurse rather than by a physician. *Id.* at 1027. Applying the principles of *Tatro,* the court found that holding the school district responsible for the provision of such "extensive, therapeutic health services" would be contrary to the rationale of the medical services exclusion in the Act, based as it is upon relieving schools of the obligation to provide services calculated to be unduly expensive. *Id.*

We agree with the *Detsel* court, that under the analysis in *Tatro,* the Shorey's argument for limiting medically excluded services to those requiring a physician's intervention must fail. The Court in *Tatro* did not hold that all health services are to be provided as related services so long as they may be performed by other than a licensed physician. 468 U.S. at 891–95, 104 S.Ct. at 3376–78; *see also Detsel* 637 F.Supp. at 1027. Rather, the Court held only that services which *must* be provided by a licensed physician, other than those which are diagnostic or evaluative, *are* excluded and that school nursing services of a simple nature are not excluded. In reaching this decision the Court considered the extent and nature of the services performed, not solely the status of the person performing the services. We must do the same.

*Id.* at 643–644 (emphasis original).

As discussed in *Clovis, Detsel v. Board of Education of Auburn,* 637 F.Supp. 1022 (N.D.N.Y.1986), *aff'd.,* 820 F.2d 587 (2nd Cir.), *cert. denied,* 484 U.S. 981, 108 S.Ct. 495, 98 L.Ed.2d 494 (1987), is a case more analogous to the present factual situation. In that case, the court found that the tracheostomy nursing services required by Melissa Detsel were constant and could not be provided by a regular school nurse who must care for other children. The evidence was that a school nurse was not always and adequately available and that the constant care of a licensed practical nurse or registered nurse was required. In concluding that tracheostomy nursing care was not a related service under the Act because of the medical services exclusion, the court distinguished cases requiring less expertise and intermittent, rather than constant, care.

*Bevin H. v. Wright,* 666 F.Supp. 71 (W.D.Pa.1987), another case factually similar to Shannon's, provides additional guidance. Bevin was a seven-year-old girl with numerous disabilities. She breathed through a tracheostomy tube, and was fed and medicated through a gastrostomy tube. Bevin had six classmates who also breathed through tracheostomies, but, unlike Bevin, none of them required constant care. The evidence was that a nurse must remain with Bevin "at all times because of the constant possibility of a mucous plug in the tracheostomy tube." *Id.* at 73. The court found that the services required went far beyond those required under *Tatro,* concluding that "to place that burden on the school district in the guise of 'related services' does not appear to be consistent with the spirit of the Act and the regulations." *Id.* at 75. The *Bevin* court went on to fortify its conclusion, citing to *Rowley,* and noting that "[a]lthough the Act presumes that all handicapped children are entitled to some form of education tailored to their individual needs and abilities, it does not require school districts to provide the best possible education without regard to expense." *Id.*

The case authority, in addition to *Tatro*, cited by Shannon for the proposition that full-time nursing care is a related service, in the court's view, is factually distinguishable. For example, in *Department of Education, State of Haw. v. Katherine D.*, 727 F.2d 809 (9th Cir.1983), *cert. denied*, 471 U.S. 1117, 105 S.Ct. 2360, 86 L.Ed.2d 260 (1985), the Court of Appeals for the Ninth Circuit found that a school district was required to provide nursing care for Katherine D., who breathed through a tracheostomy tube but only required care for her tube two or three times during the school day. The court found that this intermittent care "could have been made available in a public school setting without unduly burdening the school system" and was thus required by the Act. *Id.* at 815. Where Katherine D. only required care two or three times a day, Shannon requires constant care.

Shannon also relies on *Macomb County Intermediate School Dist. v. Joshua S.*, 715 F.Supp. 824 (E.D.Mich.1989), for the proposition that tracheostomy care is a supportive service rather than an excluded medical service. In *Joshua S.*, the Board of Education filed an action seeking a determination of whether it was required to provide Joshua S., a handicapped student, with transportation to and from school. The school district had already determined that it would provide services for the child at school. Under state regulation there was no home study option available to Joshua S. *Id.* at 827. The court found that such care did not fall under the 'medical services' exclusion, which the court, relying on *Tatro*, construed to include only "services provided by a licensed physician." *Id.* at 828. It specifically rejected the analysis of courts coming to a different conclusion, finding that they ignored the spirit of the Act, which was to "guarantee handicapped students an opportunity to gain an education." *Id.* at 826.

*Joshua S.* is factually distinguishable from the situation of Shannon. As the court noted, due to Michigan state regulations, *Joshua S.* was not eligible for homebound instruction. In light of that fact, the court stated: "Common sense, then, leads to the conclusion that transportation and the incidents thereto are necessary to fulfill the plaintiff's obligation to the defendant under the EAHCA [the Act]." *Id.* at 827. In the case of Shannon, Granite has made home instruction available to her.

### 4. Application of the Law

■ The fact that the procedural requirements of the Act have been complied with is not materially disputed by either party.[15] Shannon asserts that it is the second prong of the *Rowley* inquiry, whether the IEP is reasonably calculated to enable the child to receive educational benefits, that has been violated by Granite in that her IEP is not reasonably calculated to enable her to receive educational benefits. Shannon's IEP calls for homebound instruction.

As discussed herein, the Supreme Court in *Rowley* pronounced that the child's opportunities need not be maximized, but found that the Act requires that a basic floor of opportunity be met. *Rowley* 458 U.S. at 200, 102 S.Ct. at 3048. The Court stated that "if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction ... the child is receiving a 'free appropriate public education' as defined by the Act." *Id* at 189, 102 S.Ct. at 3042. *See also Tatro*, 468 U.S. 883, 890, 104 S.Ct. 3371, 3376, 82 L.Ed.2d 664 (1983) (court must determine if care is supportive service required for handicapped child to benefit from instruction). There is no dispute that Shannon receives personal instruction at home. There is no evidence that Shannon is not receiving some educational benefit from her personal instruction at home. There is no question, and

---

15. Granite has, however, disputed the fairness of the due process hearing based on the allegation that members of the panel were employed as special education teachers and, as such, had previously decided a similar issue. Granite also disputes the testimony permitted in the hearing that a nine-year old could provide the care needed, when the parties had previously stipulated that a nurse was required to provide this case.

Granite does not dispute, that Shannon would receive more educational benefit by having full-time nursing care which would permit her to attend school. Arguably, all medical services, including the nursing care requested by Shannon, are supportive of a handicapped child's education. However, the focus of the law is whether Granite is providing Shannon with *sufficient* supportive services to permit her to receive some benefit from her instruction.

The court is of the view that the basic floor of opportunity, as required by the Act, has been provided to Shannon. In the court's opinion, Shannon's IEP confers some educational benefit on her. No evidence to the contrary has been presented. The Act and the controlling case authority require that a child with a disability be provided with sufficient supportive services to enable the child to benefit from instruction. This Granite has done. The court, therefore, is of the opinion and finds that Granite has complied with the law. The Supreme Court has warned the courts not to interfere in the state's authority to run the schools and has limited the courts' power to intervene.[16] The decision of Granite, with respect to Shannon's instruction, must, therefore, be deferred to inasmuch as the tests set out by the Act and by the Supreme Court have been satisfied.

█ The court acknowledges the preference of Congress, manifest in the Act,[17] to mainstream children with disabilities into the regular classroom. However, the Act also provides for the child's removal from regular classes if the child's education cannot be achieved satisfactorily. 20 U.S.C. § 1412(5)(B). The harsh reality of Shannon's case is that she requires the full-time care of at least a licensed practical nurse because of the constant possibility of a mucous plug in her tracheostomy tube. Such a plug is common, occurring a number of times each day. Without the appropriate care, Shannon's disability becomes life threatening. The record reflects that Granite's three school nurses must serve 75,000 children in more than ninety schools and, therefore, are not reasonably available to provide Shannon with constant care. The cost to Granite of providing Shannon with constant nursing care is estimated at $30,000 a year.[18] The expense of providing Shannon's requested care would undoubtedly take money away from other programs. The court's decision must be tempered by paramount concern for Shannon's safety and by the Act's principle goal of providing a free appropriate public education for all handicapped children. *Lachman v. Illinois State Bd. of Ed.*, 852 F.2d 290 (7th Cir.1988); *Wilson v. Marana Unified School Dist.*, 735 F.2d 1178 (9th Cir. 1984). Accordingly, the court is further of the opinion and finds that Shannon's mainstreaming cannot be "achieved satisfactorily".

**16.** The Supreme Court has stated:

In assuring that the requirements of the Act have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States. The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child.

*Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051. The Court further stated: "We previously have cautioned that courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.' ... We think that Congress shared that view when it passed the Act.... Therefore, once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the State. *Id.* at 208, 102 S.Ct. at 3052.

**17.** 20 U.S.C. § 1412(5)(B) provides that the State establish:

procedures to assure that, to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily ...".

**18.** Granite asserts that there are at least eight children in the district waiting for the outcome of this action in order to demand full-time nursing care.

██ As an additional basis for its ruling that Granite is not required by Federal law to provide Shannon with the requested care, the court is also of the opinion and finds that the constant nursing/tracheostomy care requested by Shannon falls within the medical services exclusion of the Act, and, therefore, it is not a service that Granite must provide as a matter of federal law. The court rejects the narrow construction of the medical services exclusion of the Act based on the licensed physician distinction asserted by Shannon. Shannon's reliance on *Tatro* is misplaced. The differences between the level of care required in *Tatro* and the care required by Shannon are significant. The child in *Tatro* did not require constant monitoring. The CIC procedure, which the child would soon be able to perform for herself, could be performed by a layperson a few times a day. In contrast, Shannon requires constant care to monitor and clear her tube. The parties have stipulated that the care of at least a licensed practical nurse is required. The testimony presented at the administrative hearing reflects that the constant care required by Shannon cannot be provided by Granite's three school nurses, who have responsibility for 75,000 other children in ninety schools within the district.

## IV. CONCLUSION

There is no dispute in this case as to the facts. The only question is one of law. Due weight has been given to the administrative proceedings and their findings. However, the court is of the opinion that the Administrative Hearing Officer and State Review Panel have not applied the case law necessary to interpret the sometimes cryptic statute.

Upon *de novo* review, and after considering the extent and nature of the services requested by Shannon, the relevant statutory and case authority, and the evidence properly before it, the court concludes that the Act does not require Granite to provide Shannon with full-time nursing/tracheostomy care as a supportive service. The court further concludes that Shannon cannot satisfactorily be mainstreamed or educated with children who are not disabled. The

services requested by Shannon are also found not to be a related service under the medical services exclusion of the Act.

The court having found that Federal law does not compel Granite to provide full time nursing care to Shannon, her motion to affirm is DENIED. In view of the court's decision in this case, Shannon is not a prevailing party entitled to attorney's fees under 20 U.S.C. § 1415(e)(4)(B), and her request for attorney's fees is therefore DENIED. Shannon's Motion for Rehearing is also DENIED. *See* note 2. Granite's motion for summary judgement is GRANTED.